WILLIAM H. RUSLING et al., appellants,

v.

SARAH H. RUSLING et al., respondents.

1. The verdict of a jury on an issue sent from the orphans court is not conclusive, and the finding as to the capacity of a testator, undue influence &c., may be reviewed in this court.

2. If the evidence taken at the circuit has not been reduced to writing it can be taken anew here, and other testimony than that produced below admitted.

3. Undue influence over a testator must be satisfactorily established by other evidence than his declarations, although they are admissible to show the extent and effect of such influence.

4. The will in this case sustained, but not the codicils, they being held to have been executed while the testator was suffering under senile dementia.

Appeal from decree of Mercer orphans court.

*Mr. W. D. Holt, Mr. M. Beasley, Jr., and Mr. B. Gummere,* for appellants.

*Mr. W. F. Gaston, Mr. A. G. Richey,* and *Mr. G. Collins,* for respondents.

THE ORDINARY.

This appeal is from the decree of the orphans court of Mercer county refusing to admit to probate three instruments of writing, one purporting to be the will of Gershom Rusling, deceased, late of that county, and the others, two codicils thereto. The will is dated January 4th, 1875; the first codicil January 13th, 1879, and the other January 30th, in the last-mentioned year. The proponents are the executors, General James F. and William H. Rusling, two of the sons of the testator, and the caveators are his widow and his other son, Gershom Rusling. On the application of the caveators, the orphans court, under the provisions of the statute, certified the questions involved into the circuit court of the county of Mercer for trial before a jury. Those questions were, Whether the instruments were duly executed; whether, at the time of executing them, the testator was possessed of testamentary capacity, and whether the execution thereof was procured through undue influence, imposition or fraud upon him. The issue framed thereupon was tried in the circuit court before the chief-justice, and the trial resulted in a verdict against the will and codicils. The orphans court, as directed by the statute, made a decree in accordance with the finding, and it ordered that the costs of both sides, with their counsel fees, be paid out of the estate.

The respondents insist that the finding is conclusive, and that inasmuch as there is no error in the entry of the decree upon it, the decree must be affirmed. The statute provides (*Rev. p. 756* §§ *19, 20*) that when any caveat shall be filed against the probate of a will, the orphans court may, on the application of the caveator or of the persons named as executors in the will, certify the questions involved in the controversy into the circuit

court of the county, for trial before a jury; that upon filing the certificate with the clerk of the circuit court, that court shall have jurisdiction to try the cause on an issue to be framed by the judge holding the court; that the notice for trial, proceedings for summoning and empaneling a jury and of the trial of the cause, shall be the same as in causes commenced in the circuit court; that the same costs shall be taxable as in other causes in that court; that the verdict of the jury shall be subject to be set aside and a new trial granted in the circuit court as in other cases in that court, and that the judge may, on an application for a new trial, certify it to the supreme court for its advisory opinion. It further provides that on the trial in the circuit court the testimony of the witnesses shall be taken down in writing, if required by either of the parties, and that exceptions may be taken to the admission and rejection of testimony, which shall be entered upon the record; that it shall be the duty of the judge before whom the issue is tried, forthwith, after the trial is finally concluded, to certify and return to the orphans court the proceedings thereon had, and the verdict of the jury, together with the testimony, if it shall have been reduced to writing, a copy of the charge to the jury, all exceptions which shall have been taken at the trial to the admission or rejection of evidence, or to the charge to the jury, a certified copy of the costs which shall have been taxed, and a statement of the expenses of the trial; that the certificate and return shall be filed by the surrogate, and thereupon the orphans court shall proceed to make a decree touching the probate of the will, in accordance with the finding of the issue, and may make such order concerning the costs and expenses and allowance of counsel fees as may be made in cases where the hearing upon a caveat against proving a will is had before the orphans court. This provision for the trial by a jury, in the circuit court, of the questions arising on the application for probate of a will, has been held not to be in contravention of the constitution. *Embley* v. *Hunt*, *2 Stew. Eq. 306*. If, as the respondents' counsel insist, the finding of the jury is conclusive as to the merits of the controversy, they cannot be considered on appeal. But the constitution provides that all

persons aggrieved by any order, sentence or decree of the orphans court, may appeal from the same, or from any part thereof, to the prerogative court, and that such order, sentence or decree shall not be removed into the supreme court or circuit court, if the subject matter be within the jurisdiction of the orphans court. *Const. art. VI. s. 4* § *3.* And the statute makes like provision for appeal, limiting the time for the exercise of the right. *Rev. p. 791* § *176.* The right of appeal thus secured by the constitution cannot be taken away by the legislature. It was designed to afford to the litigant a review by this court of the judgment of the orphans court in all orders, sentences or decrees, within the jurisdiction of that court, by which he may be aggrieved. And where the verdict of a jury is substituted by law for the finding of that court, the right of appeal involves a review of the finding here. Otherwise, in such cases, the right would be unsubstantial and of but little, if any, value. The legislature did not intend to affect the right. The finding is conclusive upon the orphans court, but not on this. It is to be dealt with here as the court of chancery deals with an issue sent out of that court, except that that court may, if dissatisfied with the verdict, send the matter to another jury, if it sees fit to do so, while this court, on the contrary, if not satisfied with the verdict, must itself proceed to judgment on the merits. The statute does not ordain that the testimony shall be taken down in writing, except where the parties, or one of them, require it. On an appeal from a decree based on the finding of an issue, if no such requirement shall have been made, and the testimony shall not have been reduced to writing, this court would, in accordance with its practice, give leave to take the testimony here. And in its review of the decree, it would not be confined to the testimony or the witnesses before the jury, but would pass upon the merits in the light of the testimony taken here. Where this court is called upon to review, on appeal, either the finding of a jury or the decision of the orphans court, on a question of fact on the record of the testimony of the witnesses who were before the jury or orphans court, the fact that the jury or orphans court had the advantage of seeing and hearing the witnesses,

and noting their manner in giving their testimony, while this court has their testimony in print or manuscript only, and neither sees nor hears them, is not to be forgotten; but this court is as free to consider and decide upon the merits as it would be if the cause were before it originally. In this case I am called upon to review the decree upon precisely the same testimony which was before the jury. As before stated, the verdict was against both the will and the codicils, and was based both on the ground of want of capacity and the existence of undue influence.

The will was made in January, 1875, and the codicils in January, 1879, four years afterwards. When the will was made, the testator was about eighty-one years of age, and when he made the codicils he was about eighty-five. He left a widow, who was his third wife, and three children, the sons before mentioned, Gershom, William Henry and James, and a granddaughter, Eliza R. Bray, still a minor, the sole issue of a deceased daughter who died in 1873. He had another daughter, Mrs. Hance, who died in 1872, without issue. Not only do the testamentary witnesses testify to his competency when the will was made, but the great preponderance of the other evidence in the cause on the subject establishes the fact that he was then possessed of testamentary capacity. At that date he transacted business, and his competency to do so appears not to have been questioned by those with whom he dealt. The will, it should be stated, was drawn by his son, General Rusling, who was a lawyer in Trenton, where the testator lived. It is an important fact that, in October, 1873, and December, 1874, the testator made two wills, both of which were drawn by Mr. James S. Aitkin, a lawyer, also of Trenton, and who was in no way connected with him, the instructions for each of which were given by himself, without assistance from any one. The latter will was executed within a month of the time when the will in question was made. On the occasions when those wills were drawn by Mr. Aitkin, the testator called upon him alone and consulted with him, giving him his instructions. Mr. Aitkin made a memorandum of the instructions and read it over to him, and he approved of it. The

will was subsequently drawn, and on another day he came to Mr. Aitkin's office to execute it. The will was read over to him, and he approved of it and executed it. His conduct in making those wills bears all the evidence of the possession by him, at those times, of full testamentary capacity. The will in question differs from that drawn by Mr. Aitkin and executed but a few days previously, only as to the limitations over of a legacy of $5,000 given to the granddaughter, and those of a fund of $4,000, which the testator directed to be invested during his wife's widowhood, for her benefit. By the will of 1874, he directed that the legacy to Miss Bray be invested for her benefit, and that the interest be paid over to her, at the discretion of his executors, during her minority, and that, on her attaining to her majority, the fund, with all its unappropriated interest, be paid to her. By the will in question, he directed that the fund be invested and the interest applied, in the discretion of his executors, for her advantage during her minority, and if she should marry and have lawful issue which should attain to the age of two years, the principal and all unappropriated interest was, on the issue's attaining to that age, to be paid over to her as her separate estate, with full power to dispose of it; but power was given to the executors to pay over the fund to her after she should have reached her majority, if they should see fit to do so. The will also provides that, in case she should die before attaining her majority, or if, having reached it, she should die without lawful issue before the legacy should have been paid to her, the fund should be divided equally between the testator's sons William Henry and James. By the will of 1874, the fund of $4,000 for the testator's widow was, on her death or remarriage, to be equally divided among his three sons and his granddaughter, Eliza R. Bray. By the will of 1875, it is to be divided equally between William Henry and James. The will of 1874 gave $2,500 more to William Henry than to James. By that of 1875, the gifts to them are equal. The main reason for making a new will in 1875 was that the testator had learned that, under the provisions of the will of 1874, the legacy to his granddaughter, Miss Bray, would be a vested legacy, and in

case of her death during her minority, would go to her father, which he not only did not contemplate, but was desirous of preventing. He wished that, in that event, it should go to William Henry and James. Another reason was that James was very sensitive (and so expressed himself to his father) in regard to the inequality between the gifts to him and William Henry in the will of 1874. He apprehended that it might stigmatize him in the minds of people; and he therefore requested his father to carry out his design to give William Henry $2,500 more than him in a different way—that is, by advancing that sum to the former and making them equal in his will. The testator appears to have been willing to humor him in that fancy. He also seems to have desired to confine Gershom's and Eliza's interest in his estate to a legacy of $5,000 to each of them.

The widow and Gershom, the caveators, urge that the will of 1875 is unjust to them—that fairness in the testamentary disposition of his property required the testator to make much larger provision for her and to give to him an equal portion with his brothers; and they also urge that justice required that he give to Eliza the share which her mother would have had, had she lived. An examination of the various previous wills of the testator which have been offered in evidence, shows that the will in question was, in all these respects, in accordance with his settled designs. It gives to the widow $2,000 absolutely, and the interest of $4,000 during widowhood, and it gives her all the property which she brought to the testator or acquired afterwards with her own estate. These bequests are declared to be in lieu of dower. She married the testator in 1860, and was his third wife. She had property of her own then, and had expectations, also, which have since been realized, and she admits that she is now worth, irrespective of the provision made for her by the will, at least $11,000, without taking into the account a mortgage of $5,000 held by her on her brother's property. The testator appears to have borrowed $1,000 from her in or about 1863. By the will of that year (it is dated December 5th), he gave to her an annuity of $120 during her widowhood, and $1,000, which he states is the amount of certain moneys

Rusling v. Rusling.

which he had received from her of her separate estate, after their marriage. He also gives her all the personal property she brought to him. These gifts are declared to be in lieu of dower. By the will of 1865 he made the same provision for her, except that he gave her an annuity of $180, instead of one of $120. By the will of 1873, he gave her $2,000, with interest from his death and the interest of $4,000, equal, at the rate of interest then allowed by law, to an annuity of $280. He also gave her all the property she brought him at her marriage, and all she had acquired afterwards, and these gifts were expressed to be in lieu of dower. The will of 1874 makes the same provision for her, and so does the will in question. So that, so far as the provision for his wife is concerned, the will of 1875 was in accordance with his intentions as evidenced by his wills from 1863. The provision for Gershom in the will of 1875 is, except so far as the change between the provisions of that will and those of the will of 1874 above stated are concerned, also in accordance with the testator's intentions, as shown by the previous wills. By the will of 1863 (his daughters were then living), after making provision for his wife and the payment of his debts, and the expenses of settling his estate, he gives the residue to his three sons and his two daughters, but in such shares that William Henry and James and his daughters should each receive two shares thereof, and Gershom but one; and he states that the reason of the difference in the shares is, that he has made advances to Gershom since the latter attained his majority. The same provision is made, in the same language and the same reason given, in the same way, in the will of 1865. In the will of 1873, he gives to Gershom $4,000; to Eliza R. Bray, the granddaughter (both his daughters were then dead), $4,000, and to his sister, Mary Sharp, $1,000; and he also gives Gershom an equal share with William Henry and James in the $4,000, the interest of which is given to the widow, but makes no other provision for him. By the will of 1874, he makes precisely the same provision, and no more, for him. It thus appears that from 1863 the testator intended to give Gershom only about $5,000. As to the provision for the grand-

daughter, the amount of it is the same in the will of 1875 as it
was in that of 1874.   In the will of 1873 (it is, as before stated,
dated in October of that year, and her mother died in the pre-
ceding March), the testator gave her only $4,000.   It will be
seen, then, that in the will of 1875 the testator did not depart
from his intentions, long previously entertained, as to the pro-
vision for his widow, and it shows, also, the same intention in
the main in regard to Gershom as was exhibited in the preced-
ing wills.   The change made in the will of 1875, in the pro-
vision for the granddaughter, was not in the amount of the
legacy, but as to the manner of enjoyment and the destination
of the fund in certain contingencies.   The executors are the
same—William Henry and James—in all the wills.   The wills
of 1863 and 1865, it should be stated, were drawn by Isaac W.
Lanning, esq., then a lawyer residing in Trenton.   But if the tes-
tator was possessed of testamentary capacity when the will in
question was made, and the will is not the result of, or affected
with fraud, it must be established (it was executed with all due
legal formalities), and it is not necessary to search for reasons
for the disposition which it makes of the testator's property.
*Stat pro ratione voluntas.*   It may be added that as late as 1877
the caveators seem to have considered the testator competent to
make a will.   I am of opinion that at the time of executing
the will in question the testator was possessed of testamentary
capacity.

But it is urged by the caveators that he was induced to exe-
cute the will by fraud on the part of his son James.   They rely
for proof of the fraud, which is charged to have been undue
influence, on the declarations and statements of the testator.
On the trial, the chief-justice charged the jury that such declar-
ations and statements were not lawful evidence thereof; that it
must be shown by other evidence, and that unless there was
substantial evidence independent of such declarations, that
James had and exercised the alleged power or dominion over
the mind of his father, there was no legal proof of it, and that
the declarations were only competent evidence to show the effect

of the power and its exercise. Thàt charge was in accordance with the settled law on the subject in this state, although it has never been so declared, indeed, by the court of last resort. Applying it to the evidence, there is no proof of the alleged undue influence. The will should be admitted to probate.

To consider the codicils : They were made four years after the will, and the testator was then about eighty-five years old. He was in an advanced stage of senile dementia. To the first codicil Henry D. Phillips and Thomas E. Baker were witnesses, and to the other, Mr. Phillips and Hiram L. Rice. Both codicils were drawn by General Rusling, and they were both ready for execution · when the witnesses were called in. Mr. Baker ̇ testified that Mr. Phillips, who was a clerk in General Rusling's office, called him in from his store, which was near General Rusling's office ; that he went at once, and went into the back office, where he found the testator and General Rusling ; that the latter told him his father wished him to be a witness to his · signing the codicil, and he then called in Mr. Phillips, who came· in accordingly, and General Rusling stepped to his father and said, " You called Mr. Baker here to witness the codicil to your will ?" and the testator said yes, that he wanted him to witness it. Neither of the witnesses appears to have had any conversation beyond this with the testator at that time. When the second codicil was made, General Rusling called in Mr. Rice to witness its execution. Mr. Rice says he conversed with the testator for ten or fifteen minutes after the execution of the codicil on that occasion, on the subject of the comparative merits of old-time and modern Methodism, and that the testator conversed with intelligence and discretion. He subsequently says, however, that it could be clearly seen that the testator's mind was not in full vigor on all subjects ; that sometimes he would repeat the same thing over again, and that his memory seemed to be a little at fault. Though he had known the testator for twenty-five years, he says he supposes he had not met him half a dozen times in as many years latterly. The other witness, Mr. Phillips, does not appear to have had any conversation with the testator. The

proof is that the testator was at that time in a condition of senile dementia, so far advanced, according to one of the medical witnesses, as to be a complete imbecile.   To advert to the testimony of some of the witnesses, not connected with the family, on the subject: James Hendley, who attended the testator occasionally from the summer of 1875 up to and including 1878, to put on or adjust a truss which he wore for hernia, from which he suffered greatly, testifies that in the latter part of 1877 the testator's memory was so bad that he would not recognize him; would ask who he was and what he wanted, and when his wife would tell him who he was, he did not appear to understand it; that when she told him what his business was with him—to put on the truss—he would seem to recollect him, but not through the whole conversation. He says he thinks it was the same in 1878, in which year his visits were frequent.   He did not attend him in 1879. George F. Wilson, who lived in the house adjoining that in which the testator lived, from the spring of 1877 to the time of the testator's death, testifies that in 1877, and up to 1880, the testator would frequently come into the witness's house and say he was afraid, or that some one was going to hurt him, or something of that kind, and would want to stay all night; and quite frequently, when the door was open, he would run right into the house, and, in fact, came in several times when the dead-latch was up, and was found by members of the witness's family wandering about in the dining-room or parlor; that he would generally be excited when he came in, and frequently would say some one was going to rob or kill him, and that he appeared to be in terrible fear, and exhibited great earnestness, and seemed to be very much excited, and was oftentimes crying bitterly.   He adds that he seemed to be constantly growing worse. He also says that at times he would seem to be quite rational, but only for a few sentences.   George D. Scudder testifies that in the fall of 1876, or early in 1877, he saw the testator, as he was passing the latter's house, standing by the fence in his front yard; and the testator accosted him, and said, "Young man, I want you to come here and stay in this house to-night; this property will be all yours when I am gone, and I want you to look after it.   I stayed here last night, but they treated me so badly

Rusling *v.* Rusling.

I don't want to stay any longer." The same witness speaks of seeing him in the street-car on an occasion, about 1879, when the testator was accompanied by his son William Henry; and the testator asked what place the First Presbyterian Church was, and what place General Rusling's house was—places with which he was perfectly familiar when of sound mind. Alexander Birdsell says that soon after December, 1876, the testator, as the witness was passing his house, asked him what the distance was from the house to a neighboring church; and when he replied that it was about one hundred and fifty or one hundred and seventy-five yards distant, as it was, the testator answered that he was mistaken; that they had measured it when the turnpike was laid out, and it was a mile, or about a mile. He further says that in 1877 he saw him standing at the fence in front of his (the testator's) house, holding tightly to the railing; that the testator said to him that he had to go to Trenton that night, and had just missed the only train, and that if the witness would hire a team and take him to Trenton, he would pay all necessary expenses and reward him amply for his trouble. The testator was then in Trenton. Benjamin Gooding, who was an attendant of the testator for about three weeks, in 1878, testifies to his great infirmity, both of mind and body, at that time, arising, manifestly, from the progress of decay from age. Among other things strongly exhibiting his feebleness of intellect, he says that he very seldom recognized him when he came in, but received him as a stranger. Franklin S. Mills testifies to an incident which occurred in the fall of 1878, in which the testator, in the street in Trenton, causelessly and with tears implored protection from him against William Henry, who was attending him. Mr. Mills says that from that time he considered him childish. Charles Bechtel says that, up to 1879, the testator would always know him, but after that he only recognized him occasionally. Anthony Wengert, the barber by whom or by whose employees the testator was shaved, says that in 1878 or 1879 the testator did not talk sensibly. Judge Scudder relates a conversation which took place in 1878, in which the testator gave evidence of great mental imbecility. Dr. Phillips says that in October and

November, 1878, the testator was in a condition of general ill-health, and there was considerable mental disturbance; that his physical condition was one of great prostration, and his mental condition corresponded with his physical.   He also says that in 1878 or 1879 the testator was in an early stage of senile dementia, and that in November, 1878, he was "in a condition of a sort of maniacal outbursts, to which senile dements are subject on occasions."   He saw him on the 11th of January, 1879, but had very little conversation with him, and his opportunity for observing his mental condition does not appear to have been such as to enable him to give a reliable opinion on the subject. Dr. Woolverton, whose opportunities for observation were excellent, says that for the three years next preceding his death the testator was what he would call an entire imbecile.   From this testimony (and there is much more to the same effect), it can be gathered what the condition of the testator's mind was at that time.   It is to be remembered that the codicils were made within a few days of each other, and have reference only to the legacy to the granddaughter.

It appears from General Rusling's testimony that the testator was induced to make them through the statements and urgency of his wife.   He says she filled his (General Rusling's) mind with all sorts of disagreeable stories about the girl, and inveighed bitterly against her, and urged that the will be altered so that she would have only the interest of her legacy.   General Rusling was embarrassed with the matter, and reluctant to move in it.   His language is:

"I did not know what to do about it; my father was old and feeble, and I anticipated that at some time we would have to fight out this affair; I was greatly anxious about it; Mrs. Rusling still insisted something must be done, and brother Henry was anxious something should be done."

He then says that his father was communicated with, and said she ought to be cut off without a dollar, and wanted the will fixed in some way so that she could only have the income of the $5,000.   He further says:

"I said but little about it; I said she is a young girl; life is before her, and she may reform, and I don't think it well to tie up the money; further on, some days before the date of the first codicil, my father came into my office alone, and sat down, and told me of these stories that Mrs. Rusling had recited in my presence and in the presence of my wife, and I think Miss O'Kell, and in the presence of my cousin, Mary A. Snyder, and said that he wanted Lyda's [Eliza's] portion fixed so she could not have anything but the income of it."

He says the testator insisted upon it, and he drew the codicil. He proceeds to speak of the history of the second codicil as follows:

"After some time, my father—Mrs. Rusling was still inveighing against my niece; I beg to be excused from telling the stories she told me; I do hope she won't insist on my telling them before this court; I have cause to believe that some of the stories she told me were not true; the most I knew about Miss Bray at that time was what Mrs. Rusling told me; father came to my office repeatedly, very angry, and when I met him at the house he was very angry; he said to me on repeated occasions, 'I want to cut Lyda Bray off; I don't want her to have one penny of my property; she don't deserve it; her conduct is such as to disgrace me and my family, and I don't want her to have one penny of my money.'"

It will be seen that the action of the testator in making the codicils was entirely due to the tales told him by his wife to the discredit of his granddaughter (General Rusling says she inveighed bitterly against the girl), and the pressure made upon him to change his will in respect to her legacy. It appears, from his testimony, that General Rusling was a very reluctant actor in the matter. What those tales were does not appear. General Rusling says they were " all sorts of disagreeable stories." He also says that the most that he knew about [against] the granddaughter then, was what his stepmother had told him. There is no proof whatever as to what the alleged misconduct was; but it appears that at the very time when the tales were told the granddaughter was a visitor in General Rusling's family. Beyond all question, the testator then was of very weak mind, to say the least of it, and it is very evident that the charges and pressure had a great effect on him. According to the weight of the evi-

dence, he was not then possessed of testamentary capacity. In this connection it may be stated that the executors appear to have hesitated to offer the last codicil for probate. By their statement in writing, attached to it, the hesitation is attributed to the fact that the sole effect of that codicil is to reduce the legacy to Miss Bray, and add the amount taken from her to the gifts to them.

The decree of the orphans court will be reversed so far as regards the will, and the will will be admitted to probate, but as to the codicils, the decree will be affirmed. It will also be affirmed as to the direction that the costs and counsel fees of both sides be paid out of the estate, and also as to the amounts allowed. The costs of this appeal, with a counsel fee of $250 to each side, will be paid out of the estate.